Matter of Veronica G. v Monroe County Dept. of Human & Health Servs. (2004 NY Slip Op 50768(U))

[*1]

Matter of Veronica G. v Monroe County Dept. of Human & Health Servs.

2004 NY Slip Op 50768(U)

Decided on July 8, 2004

Family Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 8, 2004

Family Court, Monroe County
In the Matter of a Custody/Visitation Proceeding 
 under Article 6 of the Family Court Act, VERONICA G., Petitioner, 
against
MONROE COUNTY DEPARTMENT OF HUMAN AND HEALTH SERVICES, TIFFANY J., BERNARD M., Respondents.
V06012-04

Lori-Ann Ricci, Esq., for DHHS
Thomas A. Rohr, Esq., for petitioner
Steven R. Weisbeck, Esq., Law Guardian

Marilyn L. O'connor, J.
Petitioner Veronica G on May 11, 2004 filed a petition under Article 6 of the Family Court Act seeking custody of Sheryl M (DOB 11/25/02). By this motion the Department of Human and Health Services ("Department") seeks to dismiss the custody petition. The Department argues that the great-aunt lacks standing, failed to state a cause of action, and is not acting in accord with public policy and that the petition is not in the best interests of the child. For the reasons set forth below, the Department's motion to dismiss the petition is denied.
Sheryl has been in the custody and care of DHHS since November 26, 2002, the day after she was born, when she was removed by emergency removal in an article 10 neglect proceeding (NN 07416-02). Since November 26, 2002, Sheryl has remained continuously in the custody of foster parents who are ready and willing to adopt her, when and if she is freed for adoption. The Department's motion papers state that the Department "has petitioned the Court to terminate the parental rights of the child's parents in order to begin the process of freeing the child for the purposes of adoption by her current foster parents." It appears that the foster parents comprise the only family Sheryl has ever known, and not surprisingly, the law guardian supports the Department's motion to dismiss the great-aunt's custody petition. However, the issue before the court is a legal one, and bonding facts are irrelevant at this time.
[*2]
The child was approximately 18 months old at the time petitioner filed for custody.
At that time, termination petitions were pending against both of Sheryl's parents. Two days after petitioner filed for custody, this court made a finding of abandonment against Bernard M, the child's father, and on May 19, 2004 his parental rights were terminated (B 11465-03). On June 30, 2004, while this motion was pending, Sheryl's mother consented to a permanent neglect finding in the termination proceeding against her (B 1951-04). The matter has been set for a dispositional hearing. That dispositional hearing could result in a dismissal of the petition, a suspended judgment, or commitment of the guardianship and custody of the child to the Department, on such conditions as the court deems proper, if any, and with a prompt permanency hearing under FCA 1055-a. (FCA § 631, 634). Under 1055-a (6), the appropriateness of the child's service plan is to be reviewed, and the child could be placed for adoption, referred for legal guardianship, or placed permanently with a fit and willing relative. The great-aunt could be such a relative.
LACK OF STANDING
The lack of standing basis for the motion to dismiss has no merit. Even the Department admits that FCA § 651 is silent as to who in addition to parents may petition for custody, other than grandparents, and it is common knowledge that all sorts of relatives, and non-relatives, routinely petition for custody in Family Court.[FN1] Matter of Janet S. M. M. v Commissioner of Social Servs. (158 Misc2d 851), cited by the Department for the proposition that a non-parent seeking custody must have some established caretaking or legal relationship with the child, does not actually support the Department's motion. It says (at p. 857):The question of standing to petition for custody is largely a question of whether the petitioner has an interest in the welfare of a child. The court, in exercising its jurisdiction, "acts as parens patriae to do what is best for the interest of the child" (Finlay v Finlay, 240 NY 429, 433). In accordance with this rule, Matter of Trapp v Trapp (126 Misc 2d 30) held that anyone with an [*3]interest in the welfare of the child has standing to petition for custody under Family Court Act § 651.
The Janet S. M. M. Court went on to find a girlfriend of the incarcerated father in that case had no standing to sue for custody, saying (at 857-858):
Petitioner has no blood, marital, caretaking, or social relationship with the child and is, in effect, a complete stranger to her. Granting standing to such a person would open the floodgates of litigation and unduly burden and complicate custody proceedings. As the court in Matter of Humphrey v Humphrey (supra) cogently observed, the Family Court Act was "designed to prevent spurious and malicious suits . . . by disgruntled third parties who may not approve of the life style of the parent or the manner in which the child is being raised" (supra, at 178). Taken to its outermost limits, courts would be required to entertain each and every petition brought by strangers, subjecting parents and custodians to defend such proceedings and creating an environment of confusion and instability ad absurdum.

Obviously, in the case at bar, the great-aunt is allegedly a blood relative of the child and as such can be presumed to have the natural interest in the well-being of Sheryl which is reflected by the filing of her custody petition. Petitioner's status as a blood relative, albeit a somewhat distant one, has not been contested. Blood relations appear critical. (See Luther v Rate, 226 AD2d 803 non-relatives not given standing against matrimonial grandmother regarding custody of child; Cindy P v Danny P, 206 AD2d 615 former step-parent did not have standing to assert legal action for visitation despite agreement granting him visitation; cf. Matter of Ronald FF v Cindy GG, 70 NY2d 141, holding visitation rights may not be granted to biological stranger where child is in custody of the mother.) Thus, the court acting as parens patriae can and does find that petitioner, as a great-aunt, has standing.[FN2]
The argument made by the Department, that a non-parent seeking custody must have some established caretaking or legal relationship with the child, does not apply to these facts. If the non-parent petitioner here were attempting in reality to obtain custody from one or both parents, that would be true. (See Bennett v Jeffreys, 40 NY2d 543.) But in the case at bar, petitioner is unquestionably attempting to obtain custody of her grand niece instead of allowing the little girl to be adopted by non-blood-relative foster parents. Termination of the mother's rights with commitment of the guardianship and custody of the child to the Department for adoption by the unrelated foster parents is the Department's express plan for Sheryl. Significantly, the great-aunt has the support of the girl's own father, whose parental rights have been terminated. The mother's position regarding the great-aunt is not known by the Court, but she, too may support the great-aunt. Considering the importance of family and the constitutional protection accorded to family relationships [FN3], it is difficult to imagine how a blood relative [*4]supported by one or both parents could possibly lack the necessary standing to sue for custody of a child temporarily in the custody of non-relatives and intended for adoption by them.
FAILURE TO STATE A CAUSE OF ACTION
The Department alleges that the custody petition fails to allege a cause of action upon which relief can be granted. This argument also has no merit. The petitioner used the standard custody petition form and indicated that the child is in foster care, and that if the petitioner had the child, she would "grow up in a stable environment, [with] proper care, love affection from her natural family". She seeks custody and/or visitation. This is adequate to state a cause of action. The Department's argument implies that the great-aunt seeks to deprive a natural parent of custody and has not stated a basis for doing so under Bennett, supra, while the admitted facts at the time of the filing of the great-aunt's petition were that neither mother nor father had custody of the child. Neither has custody at this time. The father's rights have been terminated and the mother's parental rights appear on the verge of being terminated. The heart of this matter is a dispute between a great-aunt and unrelated foster parents, and the great-aunt's custody petition establishes that dispute. A cause of action is stated.
PUBLIC POLICY AND BEST INTERESTS
The Department finally argues that the great-aunt's petition requesting custody of Sheryl is against public policy and against the best interests of the child. This argument has no merit on this motion. The Department and the law guardian are trying to protect the foster family's desire to adopt. This cannot outweigh a blood relative's interest in custody as a matter of law on a motion to dismiss. In Smith v Offer (431 US 816 at 844-846), the U.S. Supreme Court refused to "dismiss the foster family as a mere collection of unrelated individuals". However, it found only "the most limited constitutional 'liberty' in the foster family", as compared to the constitutional protection accorded the natural family, i.e., a "liberty interest that derives from blood relationship, state-law sanction, and basic human right." As a matter of law, and on the facts now known, the foster parents' rights do not defeat the rights of a blood relative, and best interest arguments are premature. Bests interests will be relevant at the termination of parental rights dispositional hearing and the subsequent permanency hearing. (See Betty C. v Ulster County Dep't of Social Servs., 299 AD2d 758, supra.) Significantly, in ultimately ascertaining the child's best interest, the court will be guided by a principle which reflects a "considered social judgment in this society respecting the family and parenthood" not just parenthood (Bennett v Jeffreys, 40 NY2d at 549, supra, quoting Matter of Spence-Chapin Adoption Serv v. Polk, 29 NY2d 196, 204).
The law guardian argues that the great-aunt lacks standing to participate in any permanency hearing, as opposed to the custody case in which this motion is pending, citing Matter of Dana C, 2002 NY Slip Op 40005U. Dana C (supra) points out that foster parents are expressly entitled to notice and opportunity to be heard under FCA § 1040, which does not similarly provide notice and opportunity to be heard as a matter of law to this petitioner as great-aunt. However, FCA § 1055-a(4) allows the court to give notice of a permanency hearing to foster parents and "such other person as the court may, in its discretion, direct". That section also says that each person who gets notice shall be a "party" entitled to "participate". Thus, the court could grant the great-aunt notice and an opportunity to be heard as a party in any FCA 1055-a permanency hearing ordered, if and when Shy-Asia has been freed for adoption.
The court further notes that it is unfortunate that the great-aunt did not appear earlier with [*5]regard to proceedings about Sheryl. It has been argued to the court that the great-aunt filed for custody promptly upon learning of Sheryl's existence, but whether or not this is true is not known. How and when the great-aunt learned Sheryl was her great niece is yet to be alleged and determined. Certainly, the law guardian is correct to question whether petitioner knew about Sheryl long before she filed her custody petition. If she knew but failed to take action, such facts could be relevant to a custody determination. The court takes judicial notice of the fact that SSL § 384-a requires the department, prior to placing a child in foster care, to conduct an immediate investigation to locate relatives with whom the child might be appropriately placed. FCA § 1017 also requires an immediate investigation to locate relatives of a child when a court determines the child must be removed from his or her home, as was the case here (see NN 07416-02). SSL § 384-b(3)(e) similarly requires the court to take judicial notice of efforts to locate a child's parents or other known relatives when a proceeding is initiated on the grounds of abandonment of a child less than one year of age. This section applied to Sheryl, as the father was charged with abandonment. (See also FCA 1055[b][vii][A].) Finally, the court takes judicial notice of FCA § 1005(b)(vii)(B)(3), which says, "That it is the legal responsibility of the commissioner of social services to unite and reconcile families whenever possible. . . ." This is a strong policy statement which may be interpreted as clashing with SSL § 374(1-a), which gives foster parents a preference with respect to adoption in all contracts between an authorized agency and foster parents. Blood relatives, of course, are not bound by those contracts, since they are not parties to them.
Whether or not an investigation for Sheryl's relatives was conducted is not known. Indeed, the Department has not alleged that it conducted the required investigation, let alone offered evidence that it did so, located the great-aunt, and advised her of her rights, which she ignored until months later. Accordingly, it remains possible that the great-aunt had no idea that Sheryl existed until just before she filed her custody petition, that the Department failed to make a search for relatives, that petitioner acted promptly, and that she could provide a good home for Sheryl, thus keeping her with blood relatives.
NOW THEREFORE, for the reasons set forth above, it is
ORDERED that the motion to dismiss the petition of Veronica G, great-aunt, for custody of Sheryl M, is denied.
DATED: July 8, 2004
Rochester, N.Y. MARILYN L. O'CONNOR
 FAMILY COURT JUDGE
Footnotes

Footnote 1: Great-aunts have been involved in numerous reported cases involving custody. E.g., In re Dana Lisette S., 5 AD3d 387 intervenor great-aunt's custody petition after termination of mother's rights dismissed without discussion; Johnson v Baker, 307 AD2d 318 great-aunt obtained custody vs. father; Patience B v Admin for Children's Servs., 306 AD2d 473, great aunt's custody petition dismissed after termination as recourse was to seek adoption, not mere custody; Betty C. v Ulster County Dep't of Soc. Servs., 299 AD2d 758, sick great-aunt's guardianship petition dismissed on best interests, child remained in foster care; In re Stephani "FF", 296 AD2d 606, in neglect case parents consented to temporary custody to great-aunt ; Elba M. v Alba R, 213 AD2d 362 great-aunt lost custody battle to aunt based on best interests; In re Ashley "AA", 212 AD2d 937, custody of child was continued with great-aunt after neglect finding; Bryant v Gill, 198 AD2d 349great-aunt lost best interests custody battle to aunt who had siblings; In re M. Children, 91 AD2d 612, app dismd, 58 NY2d 1046great-aunt awarded custody when neglect found against mother; Bannister v Bannister, 81 AD2d 913 great-aunt could get custody from mother; In re Yolanda S., 148 Misc2d 803 after parent did 1055 extension by consent, Department had sole discretion as to where child placed with it would reside, great-aunt and uncle and foster parents had no authority to challenge decision.

Footnote 2: For an informative discussion of the possibility of a foster parent having standing to sue for custody, see Webster v Ryan, 187 M2d 127, and Webster v Ryan, 189 Misc2d 86. 

Footnote 3: See generally Stanley v Illinois, 405 US 645; Meyer v Nebraska, 262 US 390, Skinner v Oklahoma, 316 US 535; May v Anderson, 345 US 528, Prince v Massachusetts, 321 US 158, rehrg den 321 US 804; Sinhogar v Parry, 53 NY2d 424, especially the dissent by J. Fuchsberg.